**This document was signed electronically on March 31, 2021, which may be different from its entry on the record.**

IT IS SO ORDERED.

Dated:  March 31, 2021



**ALAN M. KOSCHIK**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| In re | ) | Case No. 12-51428 |
| | ) | |
| BARRY A. PALMER, JR., | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Adversary Proceeding No. 15-05073 |
| | ) | |
| BARRY A. PALMER, JR., | ) | Judge Alan M. Koschik |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| GALAXY INTERNATIONAL | ) | |
| PURCHASING, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM DECISION FOLLOWING TRIAL ON
## <u>COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT</u>

The Court held a trial in this adversary proceeding to determine the dischargeability of

certain alleged student loan debts owed by plaintiff-debtor Barry A. Palmer, Jr. (the "Plaintiff,"

the "Debtor," or "Palmer") to defendant-creditor Galaxy International Purchasing, LLC (the "Defendant" or "Galaxy"). This Memorandum Decision constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable in adversary proceedings in bankruptcy by Federal Rule of Bankruptcy Procedure 7052.

## JURISDICTION AND VENUE

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and General Order No. 2012-7 entered by the United States District Court for the Northern District of Ohio on April 4, 2012. This is a core matter pursuant to 28 U.S.C. § 157(b)(2)(I). Venue is proper pursuant to 28 U.S.C. § 1409(a).

## PROCEDURAL HISTORY

The Debtor filed a voluntary petition under chapter 7 of the Bankruptcy Code on April 30, 2012. Among his assets, he scheduled no real property and a total of $5,700 in personal property, consisting primarily of a 2003 Ford Focus with 110,000 miles valued at $4,000.

The Debtor scheduled no debt entitled to priority pursuant to 11 U.S.C. § 507(a), but did schedule five separate student loan debts to one creditor, "Chela/Sallie Mae," in the aggregate amount of $18,872. He did not schedule any debts owed to Galaxy, nor did he serve Galaxy with notice of his bankruptcy filing. His scheduled general unsecured debts totaled $49,237.13.

The Debtor scheduled gross monthly income of $3,271.67, with a net of $2,501.81 after payroll deductions. As of the petition date, he was unmarried and had one dependent daughter, then aged 5. He scheduled monthly expenses totaling $2,400.00, leaving a monthly surplus of $101.81. Significant expenses included $300 per month in childcare, $200 per month for a car payment, and $250 per month for rent or mortgage expenses.

2

On June 18, 2012, the chapter 7 trustee, Marc P. Gertz, filed a no-asset report. The Debtor reaffirmed the $1,798.02 debt secured by his Ford Focus, which at that point had only seven payments remaining. He completed his financial management course. The Court entered an order of discharge on August 27, 2012. (Main Case Docket No. 13.) The Court entered a final decree and closed the case on August 30, 2012. (Main Case Docket No. 15.) Galaxy never appeared in the case and was not served with the notice of the final decree issued by the Court's Bankruptcy Noticing Center. (*See* Main Case Docket No. 14.)

Two and a half years later, on April 23, 2015, the Debtor filed a motion to reopen this case (Main Case Docket No. 16) for the purpose of filing the instant adversary proceeding. After a hearing, the Court granted the motion to reopen on July 18, 2015. (Main Case Docket No. 20.)

Galaxy filed a notice of appearance in the main case on July 22, 2015.

The Debtor filed the instant adversary proceeding on July 29, 2015. The Defendant filed its answer on August 31, 2015. (Docket No. 6.) The parties filed stipulations of fact on January 8, 2016 (Docket No. 12) (the "Stipulations"). The Stipulations are a single page and stipulate to a single fact:

> Defendant Galaxy International Purchasing LLC obtained a Summary Judgment against Plaintiff Barry A. Palmer Jr. in Case No. CV-2014-05-2429, Summit County Court of Common Pleas in the sum of $22,102.43, plus accrued interest of $9,385.24 through November 19, 2014, plus interest thereafter at 7.95 percent per annum plus costs.

(Stipulations at ¶ 1.)

The Court held a trial in this adversary proceeding on July 18, 2016. On August 15, 2016, both the Plaintiff (Docket No. 22) and the Defendant (Docket No. 23) filed their post-trial briefs.

## BURDEN OF PROOF

In actions to determine the dischargeability of a purported student loan debt pursuant to 11 U.S.C. § 523(a)(8), the creditor has the initial burden to establish, by a preponderance of the evidence, the existence of the debt and that the debt is an educational loan or repayment obligation within the statute's parameters. *Roth v. Educational Credit Management Corporation (In re Roth)*, 490 B.R. 908, 916 (B.A.P. 9th Cir. 2013); *see also Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (establishing preponderance of evidence standard for nondischargeability actions).

If the creditor succeeds, the burden then shifts to the debtor to prove that repayment of the educational loan or other educational debt would result in an undue hardship so as to avoid a nondischargeable judgment. This includes the burden to prove, by a preponderance of the evidence, all three prongs of the test established in *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2d Cir. 1987). *Roth*, 490 B.R. at 916-17; *see also Oyler v. Educational Credit Management Corporation (In re Oyler)*, 397 F.3d 382, 385 (6th Cir. 2005) (adopting the *Brunner* test for use in the Sixth Circuit). Undue hardship is a question of law, but based on subsidiary findings of fact. *See Educational Credit Management Corporation v. Jesperson (In re Jesperson)*, 571 F.3d 775, 779 (8th Cir. 2009).

The burden of proof in this action is foremost in the Court's mind as it finds the following facts based on the limited record presented by the parties at trial.

## FINDINGS OF FACT

The evidentiary record in this case is thin for a case that proceeded to trial. The Debtor was the only witness. While the Defendant's witness list (Docket No. 20) submitted in advance of trial disclosed a representative of the Defendant, N. John Rudd, Mr. Rudd was never called

4

and did not submit a declaration. The Defendant introduced seven exhibits, to which the Plaintiff did not object. As such, the Court's findings of fact in this case are derived from (a) the Court's docket, including the petition and other documents submitted under penalty of perjury in the Main Case, (b) the exhibits admitted at trial, and (c) the Debtor's uncontroverted testimony at trial on direct and cross-examination.

**Debtor's Educational History and Student Loan History.**

The Debtor was a student at the University of Akron from 2005 until the fall of 2007. He withdrew from the University of Akron near the start of the spring 2008 semester, because his daughter had been born in April of 2007. The exact date of his withdrawal from the University of Akron is unknown, but it is uncontroverted that he never attended a class at the University of Akron in or after 2008.

On December 19, 2007, prior to his withdrawal, the Debtor signed a "Loan Request/Credit Agreement" (the "Credit Agreement"). The lender that was a party to the Credit Agreement was Union Federal Savings Bank. The type of loan is listed as an "Astrive undergraduate loan." The Credit Agreement identifies the school as the University of Akron, and the "academic period" as "01/2008 to 05/2008."

The Credit Agreement recites in its terms and conditions:

> I understand and agree that this loan is an education loan and certify that it will be used only for costs of attendance at the School. I acknowledge that the requested loan is subject to the limitations on dischargeability in bankruptcy contained in Section 523(a)(8) of the United States Bankruptcy Code because either or both of the following apply: (a) this loan was made pursuant to a program funded in whole or in part by The Education Resources Institute, Inc. ("TERI"), a non-profit institution, or (b) this is a qualified education loan as defined in the Internal Revenue Code. The means that, in the event of bankruptcy, my other debts are discharged, I will probably still have to pay this loan in full.

(Ex. 2 at 10, hereinafter the "Credit Agreement Certification.")

5

Galaxy introduced no records directly showing that Union Federal Savings Bank ever funded the loan, let alone to whom the proceeds were advanced. Galaxy relies solely on the State Court Judgment. The Defendant's exhibits, including those from the State Court Case, do not include account statements or any other documents prepared or issued by the University of Akron during the ordinary course of its business.

Neither side has introduced any documents subpoenaed from the University of Akron, or from any other source, to show whether or not the Plaintiff was a student in 2008, whether he incurred any tuition obligation, or whether Union Federal Savings Bank funded the loan contemplated by the Credit Agreement to satisfy any such tuition obligation incurred by the Debtor with the University of Akron.

Pursuant to a Bill of Sale and a Blanket Endorsement of Credit Agreements, each dated November 16, 2009, Union Federal Savings Bank endorsed the Credit Agreement, along with an indeterminate number of other such loan agreements, to The National Collegiate Student Loan Trust 2009-1 ("NCSLT 2009-1"). Via a Bill of Sale and Assignment dated April 30, 2013, the first anniversary of the Plaintiff Debtor's petition date and eight months after his discharge order was entered, U.S. Bank, in its capacity as trustee for NCSLT 2009-1, conveyed, transferred, and assigned its rights in the Credit Agreement, along with an indeterminate number of other such loan agreements to Galaxy.

Almost two years after the Debtor received his bankruptcy discharge, the Defendant commenced a state court collection action against the Debtor on May 15, 2014, in the Summit County (Ohio) Court of Common Pleas, CV 2014 05 2429 (the "State Court Case"). The Debtor initially appeared *pro se* in the State Court Case and filed his own answer. However, he failed to respond to the Defendant's motion for summary judgment and judgment was entered in favor of

6

Galaxy against the Debtor in the principal amount of $22,102.43 plus accrued interest of $9,385.24 through November 19, 2014, plus interest thereafter at 7.95 percent per annum (Ex. 1) (the "State Court Judgment"). Neither the State Court Case nor the State Court Judgment addressed the Debtor's earlier bankruptcy case or bankruptcy discharge. The State Court Judgment made no findings that the Debtor's debt to Galaxy constituted an educational loan or repayment obligation and did not purport to consider whether the debt was nondischargeable notwithstanding the Debtor's bankruptcy discharge.

Prior to Galaxy's State Court Case against the Debtor, the Debtor had never heard of Galaxy. Indeed, he had never received any previous communication or faced any previous attempts at collection from Galaxy's predecessors in interest, Union Federal Savings Bank, NCSLT 2009-1, or U.S. Bank. He was unaware of the purported educational loan for the spring 2008 semester at the University of Akron until Galaxy served him with a summons and complaint in the State Court Case. He had never received any communication from the University of Akron about Union Federal Savings Bank's purported loan or his attendance or nonattendance as a student during the spring 2008 semester at any time from 2008 onward, including any statements or bills for tuition.

The Debtor's sworn testimony at trial, which was neither contradicted nor impeached, is the sole evidence concerning the Debtor's enrollment at the University of Akron and his educational debt purportedly owed on account of tuition and other charges incurred during the 2008 winter term. As a result, the preponderance of evidence compels the finding that he withdrew from the University of Akron prior to the start of the spring 2008 semester was not a student there in or after 2008.

**The Debtor's Financial Circumstances as of the Time of Trial.**

In the weeks prior to trial in this adversary proceeding, the Plaintiff's net pay received on a weekly basis from his employer, Akron Rubber Development Laboratory, Inc., was as follows:

| Pay Period (first day) | Net Pay |
|---|---|
| 4/11/16 | $489.24 |
| 4/18/16 | $647.70 |
| 4/25/16 | $596.75 |
| 5/2/16 | $567.60 |
| 5/9/16 | $651.86 |
| 5/16/16 | $591.91 |
| 5/23/16 | $587.04 |
| 5/30/16 | $587.05 |
| 6/6/16 | $596.76 |
| 6/13/16 | $577.33 |
| 6/20/16 | $632.13 |

(Ex. 5.) He had no 401(k) withholding. He made Roth IRA contributions of between approximately $23 and $30 per week. *Id.* His base pay rate was $19/hr. He consistently worked approximately 40 hours per week, putting him on track to achieve gross pay in the range of $38,000 to $40,000 per year in 2016. *Id.* This is somewhat above the figure in his statement of financial affairs in the Main Case, which stated gross income of $32,400 in 2011.

Seven months of the Plaintiff's credit card statements from Capital One, the most recent being his statement for November 23 to December 22, 2015, consistently show a balance over

$700 and a struggle to make any headway making payments of $60 or $80 per month. The credit limit on the card is $750 and the interest rate is 24.90%. (Ex. 6.) The transactions on this card are not numerous, and the most common and highest dollar value was with Acme, a local grocery store. *Id.*

The Plaintiff's bank account statements for July 2015, and September through December 2015, from Huntington National Bank are the final items of documentary evidence introduced into the record. (Ex. 7.) The Huntington statements show direct deposit of the Plaintiff's net pay into this account, and for most of this period, the net payments received are lower than those from April to June 2016 set forth above. The Plaintiff's weekly net pay in the period covered by these bank account statements only exceeded $475 once. The Plaintiff's net pay received on December 10, 2015, was $676.14. *Id.*

For the statement period ending July 28, 2015, the Plaintiff had a closing balance of $6.14 in his checking account and $0.23 in his savings account. For the statement period ending December 28, 2015, the Plaintiff had a closing balance of $223.46 in his checking account and $5.01 in his savings account. There were no suspiciously large transfers in and out of the account within the timeframe of the statements. This evidence suggests that the Debtor was living paycheck to paycheck.

The Debtor used the debit card connected to this account for the bulk of his personal spending in September, October, November, and December 2015. During this period, he withdrew approximately $200 in cash at an ATM per month, almost always on or shortly after a payday. The Court highlights the following transactions as likely completely discretionary:

| Date | Amount | Vendor |
|------|--------|--------|
| 9/14/15 | $89.60 | Toys'R'Us |

9

| | | |
|---|---|---|
| 9/21/15 | $67.23 | Toys'R'Us |
| 10/19/15 | $103.48 | Toys'R'Us [1] |
| 11/23/15 | $176.13 | Journeys |
| 11/27/15 | $161.15 | Toys'R'Us |
| 12/7/15 | $44.43 | Toys'R'Us |
| **TOTAL** | $642.02, or $160.51/mo. | |

It is not clear from the record how the Plaintiff pays the $250 per month listed on his Schedule J in the Main Case as his cost of housing, or the $300 per month in childcare expenses likewise listed there. None of the debits appear to be a rent or mortgage payment. The cash withdrawals would be insufficient to cover rent and childcare expenses identified in the range of those reported in the Debtor's bankruptcy petition in Schedule J as being incurred in early to mid-2012. The Debtor did not testify about this discrepancy, or change in circumstances, at trial. The Debtor did not file amended schedules when the case was reopened. Given the significant length of time between the Debtor's initial case, which was filed in April 2012 and when the case was reopened in July 2015, the Debtor's schedules may understandably no longer be accurate. However, the Court is perplexed by the lack of evidence showing the Debtor's rent or mortgage expense in 2015.

Galaxy elicited testimony from the Debtor at trial regarding his restaurant spending as evidence of discretionary income. The Court does not find this to be particularly probative. The two that appear most frequently are Taco Bell and Burger King, and even these only appear a

---

[1] A second charge of $103.48 at Toys'R'Us one day later, on October 20, 2015, was reversed as a duplicate and is excluded here.

10

handful of times per month. The Court does not find that further occasional trips to Arby's or EuroGyro or orders from Romeo's Pizza are evidence of a Debtor exceeding a minimal standard of living. The Debtor is a single father with a dependent. Sometimes a single parent simply does not have time to cook every meal from scratch.

Nevertheless, based on the Debtor's pattern of discretionary expenses, which were not simply one-time purchases, *e.g.*, around the winter holidays, but were regularly distributed over the timeframe covered by the bank statements introduced into evidence, the Court finds that the Debtor had sufficient income to make at least partial payments on an outstanding student loan. The Debtor did not meet his burden to prove otherwise.

### CONCLUSIONS OF LAW

Section 523(a)(8) of the Bankruptcy Code provides that, "unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents," a debt is not dischargeable if it is:

> (A)   (i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
>
> (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
>
> (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual;

11 U.S.C. § 523(a)(8). The statute is written in the disjunctive; a debt is nondischargeable if it falls within any of the four categories. 4 Collier on Bankruptcy ¶ 523.14[2] (2020) (noting that two distinct categories are contained within section 523(a)(8)(A)(i)).

Because of the thin trial record, even considering the exhibits attached to the pleadings from the State Court Case that are, in turn, the Defendant's trial exhibits here, the burden of

proof does the bulk of the work on both sides in this adversary proceeding. On no issue presented did any party bearing the burden of proof carry it. As a result, the Court ultimately concludes that the debt is dischargeable because it cannot be shown to be an educational loan, notwithstanding the Credit Agreement Certification. However, the Court also concludes that the Plaintiff has not shown that excepting the loan from discharge would impose an undue hardship on him.

## I.     The State Court Judgment Has No Claim Preclusive or Res Judicata Effect on the Claim Asserted in This Action.

The Court must consider the possible *res judicata* issue arising from the State Court Judgment, because the parties disagree on the extent to which the State Court Judgment establishes the underlying facts and precludes further factfinding in this Court. The Court accepts that the docket of the State Court Case accurately reflects the chronology of events in the Summit County Court of Common Pleas, and that the documents admitted into evidence are accurate copies of the documents filed with the state court. However, the entire State Court Case took place after this Court entered the Debtor's discharge. The State Court Case was commenced in 2014. The Debtor received his discharge from this Court in 2012.

Galaxy's motion for summary judgment in the State Court Case did not mention the Debtor's bankruptcy, nor did the State Court Judgment. Even assuming that the state court could be said to have implicitly considered and ruled upon the dischargeability of the debt, or ruled that the bankruptcy discharge was an affirmative defense that the Debtor failed to raise it in the state court, the State Court's conclusions regarding the applicability or scope of the discharge would not bind this Court. The Bankruptcy Code's discharge provision governing the effect of the discharge injunction "was designed to effectuate the discharge and make it unnecessary to assert it as an affirmative defense in a subsequent state court action." *Hamilton v. Herr (In re*

12

*Hamilton)*, 540 F.3d 367, 372 (6th Cir. 2008) (citing 4 Collier on Bankruptcy ¶ 524.LH [1]

("Collier"), at 524-57 (Sept. 2005) Lawrence P. King ed., 15th ed. rev.).

"The bankruptcy court is not the sole forum that can hear complaints to determine the

dischargeability of claims" and "it is undisputed that the state courts have concurrent jurisdiction

to hear such claims." *In re Milburn*, 218 B.R. 862, 864 (Bankr. W.D. Ky. 1998); *see* 28 U.S.C.

§ 1334(b). However, a bankruptcy discharge "voids any judgment at any time obtained, to the

extent that such judgment is a determination of the personal liability of the debtor with respect to

any debt discharged under section 727, 944, 1141, 1228, or 1328 of this title, whether or not

discharge of such debt is waived." 11 U.S.C. § 524(a)(1). Further, a bankruptcy discharge acts

as an injunction against the commencement or continuation of an action to collect a discharged

debt as a personal liability of the debtor. 11 U.S.C. § 524(a)(2). Therefore, "all judgments

purporting to establish personal liability of a debtor on a discharged debt, including judgments

obtained after bankruptcy, are void to that extent. They are not voidable, they are void *ab initio*

as a matter of federal statute." *Pavelich v. McCormick, Barstow, Sheppard, Wayte & Carruth*

*LLP (In re Pavelich)*, 229 B.R. 777, 782 (B.A.P. 9th Cir. 1999). *Pavelich* also held:

> If the state court construes the discharge correctly, its judgment will be enforced
> and not be vulnerable to being upset by means outside the normal appellate
> channels. If, however, the state court construes the discharge incorrectly, then its
> judgment may be void to the extent it offends the discharge and subject to
> collateral attack in federal court.

*Id.* at 783. "The concern of the drafters of § 524 was that a creditor whose debt was discharged

would bring suit in a local court after the granting of the discharge, and if the debtor failed to

plead the discharge affirmatively, the defense was deemed waived and an enforceable judgment

could then be taken against him or her." *Hamilton* at 372 (quotation omitted). To avoid such

abuses:

13

> [S]ection 524(a) declares that any judgment on a discharged debt in any forum other than the bankruptcy court is null and void as it affects the personal liability of the debtor....
>
> Accordingly, if a creditor brings a collection suit after discharge, and obtains a judgment against the debtor, the judgment is rendered null and void by section 524(a). The purpose of the provision is to make it absolutely unnecessary for the debtor to do anything at all in the collection action.

*Hamilton* at 372-73 (citing Collier at 524–61).

Therefore, the State Court Judgment has no issue-preclusive effect as to any fact relevant to dischargeability, because for issue preclusion (traditionally known as collateral estoppel) to apply, there must be a "valid and final judgment" on the issue a party argues is precluded from relitigation. *See Hicks v. De La Cruz*, 52 Ohio St.2d 71, 369 N.E.2d 776 (1977). This Court must determine whether the Debtor's debt to Galaxy, if any, is or would be dischargeable. Only if it is not would the State Court Judgment then be deemed valid and enforceable.

Galaxy is not spared this conclusion by the meagre stipulation entered into by the parties prior to trial. The parties identified the State Court Case, as well as the procedural fact that the State Court Judgment was entered following an unopposed motion by summary judgment. They agreed as to the principal amount of that judgment, its date, the amount of the prejudgment interest, and the rate at which postjudgment interest would accrue. This is not a stipulation that the debt is nondischargeable, or even a stipulation of any facts relevant to nondischargeability, such as whether the debt arose from an educational loan or any other element present in Section 523(a)(8).

## II.    Galaxy Has Failed to Show By a Preponderance of Evidence That Its Claim Is Nondischargeable Pursuant to 11 U.S.C. § 523(a)(8).

As discussed above, the Credit Agreement Certification executed by the Plaintiff-Debtor and the Defendant's purported predecessor in interest cannot operate as a stipulation of

nondischargeability.  Therefore, the Court must consider whether the evidence presented at trial supports a finding that Galaxy's claim against the Debtor is nondischargeable pursuant to 11 U.S.C. § 523(a)(8) as a "student loan" debt.  Because Galaxy introduced no witnesses or declarations of its own to establish the necessary elements of nondischargeability, relying solely on the Credit Agreement Certification and the State Court Judgment, as well as the Debtor's testimony, the Court concludes that a preponderance of the record evidence does not support a finding that Defendant Galaxy is entitled to a nondischargeable judgment.

### A.  The Creditor Has Failed to Establish a Nondischargeable Claim Pursuant to 11 U.S.C. § 523(a)(8)(A)(i).

11 U.S.C. § 523(a)(8)(A)(i) excludes from discharge two separate types of claims.  The statute excludes from discharge any debt for "an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit," or any debt "made under any program funded in whole or in part by a governmental unit or nonprofit institution."  11 U.S.C. § 523(a)(8)(A)(i). To be within either category under this clause, a debt must be either "an educational benefit overpayment or loan."  Such educational benefit overpayment or loan must then be shown to be either "made, insured, or guaranteed by a governmental unit," or "made under any program funded in whole or in part by a governmental unit or nonprofit institution."

Galaxy does not contend that its claim was made, insured, or guarantied by a governmental unit.  Instead it argues that the Debtor's debt to Galaxy falls into the latter category, asserting that the loan was made pursuant to a program funded in whole or in part by a nonprofit institution, The Education Resources Institute (TERI).  Galaxy's argument appears to mimic those made in a handful of other cases that are the subject of reported judicial opinions Galaxy cites in which a nonprofit institution guarantied a private bank loan made for educational purposes.

15

An intuitive interpretation of the statute suggests that neither Galaxy's claim in this case nor the claims of the creditors in the opinions cited by Galaxy would be nondischargeable merely because a nonprofit institution had guarantied the loan. The only reference to guaranties in Section 523(a)(8)(A)(i) is the first exception to discharge, which includes loans "guaranteed by a governmental unit." There is no parallel language in the second exception for loans made under any program funded by a nonprofit institution. Since guaranties are expressly included in the first definition, statutory construction principles hold that their exclusion from the second definition was intentional. *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537, 114 S. Ct. 1757, 128 L.Ed.2d 556 (1994) ("It is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another."). This would suggest that a nonprofit would have to do more, or something different, than serve as a guarantor in order to be deemed to have funded a loan program in whole or in part.

Unfortunately for the Debtor, that intuitive interpretation of Section 523(a)(8)(A)(i) has been rejected by numerous judicial opinions holding that loan guaranties by a nonprofit is sufficient to cause a student loan program to be a "program funded … by a nonprofit institution." *Andrews University v. Merchant (In re Merchant)*, 958 F.2d 738, 740 (6th Cir. 1992) (nonprofit university's guarantee of a loan program constituted nonprofit institution funding the loan program); *The Education Resources Institute, Inc. ("TERI") v. Taratuska (In re Taratuska)*, 2008 WL 4826279 (D. Mass. August 25, 2008) (nonprofit Defendant TERI paid reimbursed lender upon default on loan default, demonstrating that a nonprofit funded the program); *O'Brien v. First Marblehead Education Resources, Inc., fka The Education Resources Institute, Inc. ("TERI") (In re O'Brien)*, 419 F.3d 104 (2d Cir. 2005).

16

The statutory interpretation central to these cases, as well as to Galaxy's argument in this case, is summarized by the Second Circuit in *O'Brien*.

> Brien's core argument is that TERI merely guaranteed, rather than funded, O'Brien's loan, and that as such O'Brien's debt on the loan is dischargeable. O'Brien highlights the fact that the first clause of § 523(a)(8)—a clause that both parties agree is inapplicable to the current case—covers loans "made, insured or guaranteed by a governmental unit." O'Brien contrasts that language with the terms of the second clause of the section, pointing out that where the first clause uses the term "guaranteed," the second uses only the term "funded." On this basis, O'Brien concludes "that Congress excluded the term 'guaranteed' from the second clause of § 523(a)(8) for a reason. [W]here the legislature has carefully employed a term in one place and excluded it in another, it should not be implied where excluded." Appellant Br. at 15 (internal quotations omitted). O'Brien's argument has an initial appeal to it but cannot carry the day.
>
> Section 523(a)(8) does not require that TERI fund O'Brien's loan in order for that section to be applicable. Rather, § 523(a)(8) requires only that O'Brien's loan was "made under any program funded in whole or in part by" TERI. While it may be true that TERI merely guaranteed, without funding, O'Brien's particular loan, it is an entirely different question whether TERI funded the loan *program* under which O'Brien's loan was made. The district court found that TERI had indeed funded the Law Access Loan Program, *In re O'Brien,* 318 B.R. at 263; we agree.

*In re O'Brien*, 419 F.3d 104, 106 (2d Cir. 2005)

As previously discussed, it is Galaxy's burden to establish that its claim is nondischargeable. Therefore, Galaxy bears the burden of proving these elements by a preponderance of the evidence. As previously observed, Galaxy offered little evidence about the nature and origin of its claim other than the existence of its State Court Judgment and documents introduced as evidence in the State Court Case, including the Credit Agreement and bills of lading purporting to establish Galaxy's rights as a successor to the original lender.

Galaxy has two primary obstacles at this stage of the litigation with the trial record closed. First, it must show that the trial evidence established the existence of an educational loan within the meaning of Section 523(a)(8). The only evidence introduced at trial concerning the transaction at issue was the testimony of the Debtor, Mr. Palmer. Palmer testified that although

17

he had intended to attend the University of Akron in the 2008 winter term, he did not actually do so. He testified, without contradiction or impeachment, that he withdrew from the university and never attended classes in 2008. According to his testimony, he never received any proceeds of the loan personally, nor did he receive any statement of account from the University of Akron for the semester in question. While he had arranged for a loan to cover his anticipated educational expenses, he did not incur any such expenses for the semester in question, the one identified specifically in the Credit Agreement, nor did he receive any loan proceeds directly, let alone misuse them for unpermitted purposes. This testimony is probative evidence that no loan was consummated, even though one had been intended, as evidenced by the documents introduced at trial.

Possible factual counters to this story could be imagined, but none were ever discussed at trial, let alone established persuasively with evidence. Perhaps Debtor Palmer withdrew from the University of Akron too late to avoid the accrual of a tuition obligation. However, Galaxy did not show that with testimony or records from the University of Akron or from its predecessor in interest, Union Federal Savings Bank. Similarly, Galaxy offered no evidence suggesting that Palmer received the loan proceeds directly for personal use in violation of his covenant to use them for educational purposes. Moreover, Galaxy did not explain in any way why its predecessor in interest did not or could not have obtained a refund from the University of Akron when Palmer chose not to attend, even though the Credit Agreement specifically granted the creditor that power.[2] Galaxy also did not offer any evidence to show that the loan proceeds were

---

[2] Credit Agreement paragraph 8 (*Exhibit B to Defendant's Trial Exhibit 2*) at 10. The relevant paragraph of the Credit Agreement provides as follows:

> "I hereby authorize you to obtain from the School all amounts which may be owed to me by the School, including any refund due to overpayment, early termination of enrollment, or otherwise."

18

ever advanced. Without such evidence, and in light of Palmer's testimony, it is possible that

Galaxy, which acquired what purported to be an aging, nonperforming loan and quite possibly a

pool of such loans, may have acquired paper that did not evidence a loan, but merely a mirage of

one.

The preponderance of the evidence establishes that there was in fact no educational

purpose to whatever financial transaction, if any, might have been consummated between Palmer

and Union Federal Savings Bank. Moreover, the evidence suggests -- perhaps more weakly, but

without contradiction -- that no loan and therefore no debt exists at all. Therefore, the Court

finds, based on the trial record, that Galaxy's claim is not supported by or on account of an

educational loan. This factual determination is fatal to Galaxy's claim for a nondischargeable

judgment under Section 523(a)(8(A)(i).

Second, even if Galaxy had established the existence of an educational loan, it would

have to show that it was made pursuant to a program funded in whole or in part by a nonprofit

institution. Galaxy offers little evidence of such an arrangement. The only evidence offered are

the boilerplate terms in the Credit Agreement between Palmer and Galaxy's predecessor in

interest, Union Federal Savings Bank, in which the parties purportedly stipulate to certain facts

and legal conclusions.

> "I understand and agree that this loan is an education loan and certify that it will
> be used only for costs of attendance at the School. I acknowledge that the
> requested loan is subject to the limitations on dischargeability in bankruptcy
> contained in Section 523(a)(8) of the United States Bankruptcy Code because
> either or both of the following apply: (a) this loan was made pursuant to a
> program funded in whole or in part by The Education Resources Institute, Inc.
> ("TERI"), a non-profit institution, or (b) this is a qualified education loan as
> defined by the Internal Revenue Code. This means that if, in the event of a
> bankruptcy, my other debts are discharged, I will probably still have to pay this
> loan in full."

Credit Agreement paragraph 11, Exhibit B to Defendant's Trial Exhibit 2, at 10.

The Credit Agreement Certification purported to establish that the loan made pursuant to the Credit Agreement "is subject to the limitation on dischargeability in bankruptcy contained in Section 523(a)(8)," identifying two of the sub-categories within that statute as applicable. However, that prepetition stipulation is not binding on this Court. Prepetition, prospective waivers of discharge or dischargeability of particular debts are unenforceable in bankruptcy court. *See Lichtenstein v. Barbanel*, 161 Fed. Appx. 461, 467 (6th Cir. 2005) (collecting cases); *Klingman v. Levinson*, 831 F.2d 1292, 1296 n.3 (7th Cir. 1987) ("For public policy reasons, a debtor may not contract away the right to a discharge in bankruptcy"); *Simmons Capital Advisors v. Bachinski*, 393 B.R. 522, 533 (Bankr. S.D. Ohio 2008). Therefore, the stipulation contained in the Credit Agreement's boilerplate language is legally insufficient to determine nondischargeability in a later-filed bankruptcy case.

Moreover, this boilerplate language does not establish that a loan was funded, or that TERI funded in any way and to any extent a loan program pursuant to which the loan at issue was (to be) made. No evidence regarding TERI's status as a nonprofit institution or its role in this loan or loan program was offered. No evidence of the loan program was introduced.

Galaxy's argument seems to be, by analogy to the legal opinions he cites in support, that TERI guarantied the loan to Palmer. Such were the facts in both *Taratuska* and *O'Brien*. Those opinions, both appellate in nature (one by a U.S. District Court, one by a U.S. Court of Appeals) referenced specific facts shown at trial before the bankruptcy court, including TERI's guaranty of the educational loan, its satisfaction of the guaranty, and its subrogated right to the student borrower's promissory note. However, at trial in this adversary proceeding, Galaxy produced no written guaranty by TERI, even though TERI is referred to in the boilerplate terms and provisions of the Credit Agreement. Galaxy introduced no evidence that TERI repaid the loan to

20

Union Federal Savings Bank or any of its assignees, such as Galaxy. Galaxy offered no explanation as to why TERI had not met its obligation under the alleged or suggested guaranty. The Court is struck by the fact that in several of the cases that Galaxy cites for authority, including *Taratuska* and *O'Brien*, TERI was the creditor in question and a party to the nondischargeability lawsuit, either as plaintiff or defendant. Those opinions held that the fact that a private bank wrote the loan did not bar a nondischargeability finding under Section 523(a)(8)(a)(i) because the program was funded by TERI *as evidenced by* TERI having repaid the loan pursuant to its guaranty and subrogating itself as creditor under the loan. The absence of TERI in this lawsuit, and the implication that TERI did not repay the loan upon the alleged default as would be required if it had guarantied the loan, creates doubts about (i) whether TERI funded the loan program, and (ii) whether an educational loan ever existed.

If loan proceeds were, in fact, advanced and the loan was guarantied by TERI, the Court has been offered no explanation of why TERI was never called upon to fund the guaranty despite the facts that Palmer never made a payment on the loan and more than six years passed between the date of the Credit Agreement and the commencement of the State Court Case. This lack of action on the guaranty would make sense in a scenario where, notwithstanding the signed Credit Agreement, the loan proceeds were never advanced. Assuming the fact pattern Galaxy alleges (but never supports directly with evidence)—that the loan proceeds were advanced and guarantied by TERI—the lack of action on the guaranty would have no rational explanation. If this proceeding and record were before the Court on summary judgment, the Court would find this a genuine issue of disputed material fact. This adversary proceeding, however, went all the way to trial and the Defendant creditor is left with a burden of proof it did not meet. The

circumstances of this case would be very different if TERI were the creditor party, having satisfied the guaranty and stepped into the shoes of the lender.

Galaxy strenuously argues the law, which appears to be on its side, but neglects the evidence sufficient to establish the factual predicate necessary to benefit from its legal argument. The facts recited in legal opinions from other cases does not constitute evidence sufficient to make similar findings in this case.

### B. The Creditor Has Failed to Show That Its Claim Is for the Repayment of Funds Received as an Educational Benefit, Scholarship, or Stipend Pursuant to 11 U.S.C. § 523(a)(8)(A)(ii).

The third category of debts made nondischargeable by 11 U.S.C. § 523(a)(8) is defined by section 523(a)(8)(A)(ii), "an obligation to repay funds received as an educational benefit, scholarship, or stipend."

Galaxy argues that its claim falls within this category, although it does not elaborate how so. It is readily apparent that the claim is not one for the repayment of a "scholarship" or a "stipend." Therefore, the Court presumes that Galaxy argues that its claim based on a purported loan is for the repayment of an "educational benefit." However, the repayment of funds received as an educational benefit is included in a list that includes scholarships and stipends, but does not include loans, even though the immediately preceding Section 523(a)(8)(A)(i) does expressly cover loans. These items appear to concern repayment obligations, however arising, that are owed to an educational institution that acted, to borrow a commercial lending phrase, as a seller-financer. Where a university or school provides a student a grant and the grant must be repaid, perhaps because the student violated a condition of the grant, that repayment obligation is not dischargeable pursuant to Section 523(a)(8)(A)(ii). Section 523(a)(8)(A)(ii) does not apply to third-party loans or financing.

The Court reaches this conclusion by relying on an established rule of statutory and contract construction.

> *Noscitur a sociis* represents the idea that "a word is known by the company it keeps." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). Applying this principle, "educational benefit" in § 523(a)(8)(A)(ii) should be given a meaning similar to "scholarships" and "stipends" because it is "grouped in a list" and thus "should be given related meaning." *Id.*

*Dewine v. Dudley (In re Dudley)*, 614 B.R. 277 (S.D. Ohio 2020). "The better view is that the term should be read narrowly to refer to a debt arising from an educational relationship *other than a loan*." 4 Collier on Bankruptcy ¶ 523.14[2] (2020) (citing *Institute of Imaginal Studies v. Christoff (In re Christoff)*, 527 B.R. 624 (B.A.P. 9th Cir. 2015) ("While § 523(a)(8)(A)(i) and (B) indeed make "loans" nondischargeable in bankruptcy, absent undue hardship, § 523(a)(8)(A)(ii) applies to a different type of debt …"); *Dufrane v. Navient Solutions, Inc. (In re Dufrane)*, 566 B.R. 28 (Bankr. C.D. Cal. 2017); *In re Campbell*, 547 B.R. 49 (Bankr. E.D.N.Y. 2016); *In re Decena,* 549 B.R. 11 (Bankr. E.D.N.Y.), *vacated on other grounds*, 562 B.R. 202 (E.D.N,.Y. 2016)) (emphasis in original). *See also Wiley v. Wells Fargo Bank*, 579 B.R. 1, 8-9 (Bankr. D. Me. 2017).

Galaxy cites two cases in this portion of its brief in support of its position: *Roy v. Sallie Mae (In re Roy)*, 2010 WL 1523996 (Bankr. D.N.J. Apr. 15, 2010) and *Skipworth v. Citibank Student Loan Corp. (In re Skipworth)*, 2010 WL 1417964 (Bankr. N.D. Ala. Apr. 1, 2010). In *Roy*, the bankruptcy court held that the debtor's obligation to repay the loan proceeds received to enable her daughter to attend a tutoring program at a for-profit educational institution were nondischargeable under Section 523(a)(8)(ii) because "the loan at issue here … provided an educational benefit to your child in the form of tutoring." *Id.* at *1. In *Skipworth*, the bankruptcy court held that "the affidavits submitted by the debtor in support of his motion for

default judgment fail to establish that the loan obligation … is not an obligation to repay funds received as an 'educational benefit.'" *Id.* at *2.

The Court does not find the reasoning of *Skipworth* persuasive, while *Roy* is clearly distinguishable.

In *Roy*, the debtor apparently owed Sylvan Learning Center for the cost of a tutoring program. The opinion barely describes the facts of the case and the nature of the debt. Perhaps it was merely an account payable owed to Sylvan, in which case the Court is skeptical that Section 523(a)(8)(A)(ii) would apply. A debt on an open account would not appear to be similar to the repayment of a scholarship or stipend, or other "educational benefit," resulting from a reversal of a grant. However, Sylvan clearly appears to be the provider of educational services, not a third-party lender like Galaxy or its predecessors in interest, and therefore Section 523(a)(8)(A)(ii) could potentially be applicable, unlike in this case.

In *Skipworth*, in addition to ignoring the need to interpret "educational benefit" consistent with "scholarship" and "stipend," the bankruptcy court reversed the burden of proof by finding that the debtor had failed to show, in support of his default motion, that the debt in question was *not* on account of the obligation to repay an "educational benefit." The debtor bears the burden of proving undue hardship, but is not obligated to go down the list of all four categories of nondischargeable debts identified in Section 523(a)(8) and prove that the loan in question falls outside each of them so as not to qualify for nondischargeability in the first instance. When the dischargeability of the debt has been put in issue, the creditor bears the burden of proving that the debt in question falls within at least one of the four categories in Section 523(a)(8). *See Roth*, 490 B.R. at 916. Moreover, *Skipworth* concerns a third-party loan from Citibank Student Loan Corporation. *Skipworth* offered no persuasive reasoning as to why Section 523(a)(8)(A)(ii)

applied to this loan other than the loan proceeds were or might have been used for educational expenses. Citibank did not provide an educational benefit to the debtor student and therefore, in this Court's view, Section 523(a)(8)(A)(ii) would not apply.

Therefore, the Court concludes that any debt of the Debtor to Galaxy is not "an obligation to repay funds received as an educational benefit, scholarship, or stipend" within the meaning of 11 U.S.C. § 523(a)(8)(A)(ii).

### C. The Creditor Has Failed To Establish That Its Claim Arises From a "Qualified Education Loan" So As To Be Nondischargeable Pursuant to 11 U.S.C. § 523(a)(8)(B).

The fourth and final category of debts made nondischargeable, absent undue hardship, by Section 523(a)(8) is "any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual." 11 U.S.C. § 523(a)(8)(B).

With this provision, which was added to the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), Pub. L. 109-8, 119 Stat. 23, enacted April 20, 2005, and effective October 17, 2005, Congress for the first time made certain privately-originated educational loans nondischargeable in addition to educational loans backed by the governmental units or nonprofit institutions. Provided the loan constitutes a "qualified education loan" as defined by the Internal Revenue Code, 26 U.S.C. § 1, *et. seq.*, a private bank's student loan claim became nondischargeable in bankruptcy even though it is not guarantied or insured by a governmental unit or made under a program funded by a governmental unit or nonprofit institution.

"Qualified education loan" is defined by Section 221(d)(1) of the Internal Revenue Code, which provides, as follows:

25

(1) Qualified education loan.—The term "qualified education loan" means any indebtedness incurred by the taxpayer solely to pay qualified higher education expenses—

> (A) which are incurred on behalf of the taxpayer, the taxpayer's spouse, or any dependent of the taxpayer as of the time the indebtedness was incurred,

> (B) which are paid or incurred within a reasonable period of time before or after the indebtedness is incurred, and

> (C) which are attributable to education furnished during a period during which the recipient was an eligible student.

I.R.C. § 221(d)(1).

Galaxy cites *Decena* in support of its argument that its claim evidenced by the Credit Agreement falls within this category:

> In short, section 523(a)(8)(B) excepts from discharge loans for attending an "eligible educational institution," recognition of which is dictated by the Federal School Codes List for the years 2004–05, which identify "[a]ll postsecondary schools that are currently eligible for Title IV aid."

*Decena*, 549 B.R. at 21.

The court's opinion in *Decena* focused on whether the institution in question was an "eligible educational institution" within the meaning of I.R.C. § 25A(f)(2), which is a necessary component of "qualified higher educational expenses," as defined by I.R.C. § 221(d)(2) and required by I.R.C. § 221(d)(1). *Decena* does not address all the elements of a qualified education loan pursuant to I.R.C. § 221(d)(1).

In this case, no one disputes that the University of Akron is an "eligible educational institution" within the meaning of I.R.C. § 25A(f)(2). The issue in this case is whether the Plaintiff was an "eligible student," as required by I.R.C. § 221(d)(1)(C). "The term 'eligible student' has the meaning given such term by section 25A(b)(3)." That provision, in turn, defines an "eligible student" as follows:

26

with respect to any academic period, a student who—

> (A) meets the requirements of section 484(a)(1) of the Higher Education Act of 1965 (20 U.S.C. 1091(a)(1)), as in effect on the date of the enactment of this section, and

> (B) is carrying at least ½ the normal full-time work load for the course of study the student is pursuing.

I.R.C. § 25A(b)(3).

The "academic period" identified in the Credit Agreement is "01/2008 to 05/2008." The Debtor either never enrolled at the University of Akron during that academic period or successfully withdrew before incurring higher education expenses for that semester, and therefore fails to meet the definition of an "eligible student" with respect to the Credit Agreement. Therefore, Galaxy's claim evidenced by the Credit Agreement did not arise from a "qualified education loan," as defined by the Internal Revenue Code. Therefore, that claim is not nondischargeable pursuant to 11 U.S.C. § 523(a)(8)(B).

**III.    The Debtor Failed to Prove Undue Hardship by a Preponderance of the Evidence.**

The Court's conclusions of law in Part II are dispositive of this adversary proceeding. The Court has held that the Defendant failed to carry its burden of proving, by a preponderance of the evidence, that its claim falls within any of the four categories of nondischargeable student loan debts defined in 11 U.S.C. § 523(a)(8). However, the issue of whether repaying the debt would constitute an undue hardship on the Debtor was also fully tried, and the Court finds it prudent to set forth its findings on this issue as well. The Debtor has failed to show that repayment of the alleged debt would be an undue hardship.

The term "undue hardship" is not defined in Section 523(a)(8) or elsewhere in the Bankruptcy Code. In *Oyler v. Educational Credit Management Corporation (In re Oyler)*, 397 F.3d 382 (6th Cir. 2005), the Sixth Circuit adopted the three-part "*Brunner* test," eponymous

27

from *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2d Cir. 1987) (per curiam), the seminal decision issued long before BAPCPA and nondischargeable private student loans, and issued at a time when public student loans were nondischargeable only for a period of five years. The test requires the debtor to establish (1) that the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans. *Oyler*, 397 F.3d at 385 (quoting *Brunner*, 831 F.2d at 396).

In addition, *Oyler* adopted restrictive language from other circuits not present in the Second Circuit's brief *per curiam* decision in *Brunner*. Under *Oyler*, establishing the second prong of the *Brunner* test (*i.e.*, circumstances likely to persist) requires that the additional circumstances "be indicative of a 'certainty of hopelessness, not merely a present inability to fulfill financial commitment.'" *Oyler*, 397 F.3d at 386 (quoting *In re Roberson*, 999 F.2d 1132, 1136 (7th Cir. 1993)); *accord Brightful v. Pennsylvania Higher Education Assistance Agency (In re Brightful)*, 267 F.3d 324, 328 (3d Cir. 2001); *Brunner v. New York State Higher Education Services Corp. (In re Brunner)*, 46 B.R. 752, 755 (S.D.N.Y. 1985). "Such factors may include illness, disability, a lack of useable job skills, or the existence of a large number of dependents." *Oyler*, 397 F.3d at 386.

The applicability of *Brunner*, as well as the stringency of the requirements for meeting its various elements where it remains applicable, has come into question from appellate courts other circuits. *See, e.g., Krieger v. Educational Credit Management Corporation*, 713 F.3d 882 (7th Cir. 2013) ("The statutory language is that a discharge is possible when payment would cause an

28

'undue hardship.' It is important not to allow judicial glosses, such as the language in *Roberson* and *Brunner*, to supersede the statute itself."); *Long v. Educational Credit Management Corporation (In re Long)*, 322 F.3d 549 (8th Cir. 2003) ("… requiring our bankruptcy courts to adhere to the strict parameters of a particular test would diminish the inherent discretion contained in § 523(a)(8)(B)."); *Roth v. Educational Credit Management Corporation (In re Roth)*, 490 B.R. 908 (B.A.P. 9th Cir. 2013) (after bankruptcy court held that debtor met the first two *Brunner*[3] prongs but failed to meet the third prong because she failed to enter into an income-based repayment program, even though the payment would have been zero and likely would have been for 25 years, bankruptcy appellate panel reversed and held that "when absolutely no payment is forecast, the law should not impose negative consequences for failing to sign up for the program … Congress could not have intended such a lengthy, empty commitment as a requirement for a determination of undue hardship."); *Bronsdon v. Educational Credit Management Corporation (In re Bronsdon)*, 435 B.R. 791 (B.A.P. 8th Cir. 2010) (agreeing with *Hicks v. Educational Credit Management Corporation*, 331 B.R. 18 (Bankr. D. Mass. 2005) that requiring evidence of "unique" or "extraordinary" circumstances amounting to a "certainty of hopelessness" is "overkill," and that "the 'good faith' requirement of *Brunner* is 'without textual foundation.'"). In *Roth*, one judge on the panel wrote separately to make an even more pointed critique of *Brunner*, beyond what was necessary to the bankruptcy appellate panel's holding in that case:

> Congress has never defined the circumstances constituting the sort of undue hardship justifying the discharge of an educational debt under § 523(a)(8), apparently preferring that bankruptcy courts craft a working definition. While it

---

[3] The Ninth Circuit adopted the *Brunner* test in *United Student Aid Funds v. Pena (In re Pena)*, 155 F.3d 1108 (9th Cir. 1998).

might have been appropriate and helpful when adopted, respectfully, the *Brunner* test for determining undue hardship is truly a relic of times long gone.

> *Brunner* was decided by the Second Circuit in 1987 to implement the original student loan hardship discharge exception included in a still-new Bankruptcy Code. … That early version of § 523(a)(8) provided that a debtor's student loan debt could not be discharged unless either it first became due five years before the date of the bankruptcy filing or excepting such debt from discharge would impose an undue hardship on the debtor and the debtor's dependents. Importantly, in those days, without regard to the debtor's current finances, if a student loan had not been collected within the five years after it became due, Congress directed that it would be discharged in the student's bankruptcy case.

*Roth*, 490 B.R. at 920–21 (Pappas, J., concurring).

At the trial level, a bankruptcy court in the Second Circuit recently tried to chart a middle ground between calling *Brunner* itself a relic of times long gone and justifying the harshness of its recent application: "The harsh results that often are associated with *Brunner* are actually the result of cases interpreting *Brunner*. Over the past 32 years, many cases have pinned on *Brunner* punitive standards that are not contained therein." *Rosenberg v. N.Y. State Higher Education Services Corp. (In re Rosenberg)*, 610 B.R. 454 (Bankr. S.D.N.Y. 2020), *leave to appeal granted sub nom. Rosenberg v. Educational Credit Management Corporation*, No. 20-CV-688 (CS), 2020 WL 1048599 (S.D.N.Y. Mar. 4, 2020). *Rosenberg* noted that the "infamous and oft-repeated term 'certainty of hopelessness'" was not in the Second Circuit opinion in *Brunner* and seems to have first appeared in *Briscoe v. Bank of N.Y. (In re Briscoe)*, 16 B.R. 128, 131 (Bankr. S.D.N.Y. 1981), six years before the Second Circuit issued *Brunner*. While *Rosenberg* framed its analysis as one sweeping away subsequent judicial glosses, 610 B.R. at 459 ("this Court will apply the *Brunner* test as it was originally intended"), it also confronted and bulldozed the problematic application of the second prong of *Brunner*, requiring consideration of circumstances "likely to persist for a significant portion of the repayment period of the student loans," when the loan has been accelerated and the repayment period has thereby been collapsed

to zero. *Rosenberg* held that when a debt has been accelerated, "the repayment period has ended … the loan is due and payable in the full amount. The second prong of the *Brunner* test is, therefore, satisfied." *Id.* at 461.

Notwithstanding the criticism of *Brunner* by both trial and appellate courts, both where *Brunner* is followed and where it is not, *Oyler* remains the controlling authority in this circuit, which adopts the *Brunner* framework and also approvingly cites the "certainty of hopelessness" elaboration from the Seventh Circuit in *Roberson* that even that circuit itself more recently dryly noted "sounds more restrictive than the statutory 'undue hardship.'" *Krieger*, 713 F.3d at 885.

## A. Minimal Standard of Living for Self and Dependents.

The trial evidence shows that the Debtor is able to maintain a minimal standard of living for himself and his one dependent. He does not suffer from any debilitating long-term illness or disability and was gainfully employed at the time of trial. While it remains unclear how the Debtor procured his rent and childcare, and to what extent that lack of clarity is connected to his cash withdrawals as shown on his bank statements in the facts found above, it is clear that is able to meet his and his daughter's basic material needs and have a small amount of discretionary income for somewhat regular purchases at Toys'R'Us and Journeys that are not limited to the December holidays. Moreover, it is the Debtor's burden to prove that he is unable to maintain a minimal standard of living while repaying the debt in question and he failed to meet that burden.

## B. Likelihood of the Circumstances Persisting for a Significant Portion of the Repayment Period.

Because the preponderance of the evidence shows that the Debtor fails the first prong of the *Brunner*/*Oyler* test, the second prong cannot be properly applied, because the second prong calls on the Court to consider the likely persistence of the adverse circumstances found in the

first prong.  Since the Court has not found those to exist, it cannot consider their likely persistence.

Because the Debtor's failure to satisfy the first prong terminates the Court's analysis of the second prong at the outset, the Court does not need to wade into the issue raised by *Rosenberg* of whether the repayment period in this case should be considered to be zero—a potentially perilous analysis considering that Galaxy clearly *intended* to accelerate the balance due under the Credit Agreement, but any act on its part to do so may have been void by application of the discharge injunction.  No evidence was introduced to establish that any holder of the Credit Agreement and its underlying claim prior to the Debtor's April 30, 2012 bankruptcy filing accelerated the debt.  Section I of the Credit Agreement requires a creditor to give notice of such acceleration, and the Debtor testified at trial that he heard nothing from any creditor holding the Credit Agreement between the time he signed it in December 2007 and his bankruptcy filing.  If Galaxy itself attempted to accelerate the balance prior to filing the State Court Case, no evidence of that is in the record.  The record contains no demand letter or notice of acceleration from Galaxy to the Debtor, and the Debtor did not testify to any such correspondence.

### C. Good Faith Efforts to Repay.

Applying this factor is also problematic given the facts of this case.  The Debtor did not make any efforts to repay the debt, good faith or otherwise, because he had no reason to believe the debt existed after he withdrew from the University of Akron and neither the University nor Union Federal Savings Bank contacted him about any balance owed.

The Court concludes that because the Debtor was completely unaware of Galaxy's purported claim, it cannot find that the Debtor failed to make a good faith effort to repay it.  In a different set of circumstances, involving a debtor who was able to establish the first and second elements of the *Brunner* test, such a rule would provide an unfair advantage to a creditor who

32

failed to come forward to make themselves known and attempt to collect prior to a debtor's bankruptcy filing. However, because the *Brunner* test applies in this Circuit pursuant to the precedent announced in *Oyler*, the Debtor's failure to establish the first prong of the test -- that he cannot maintain a minimum standard of living for himself and his dependents if forced to make payments on Galaxy's claim -- is fatal to his claim of undue hardship under 11 U.S.C. § 523(a)(8).

## CONCLUSION

For the reasons stated in this Memorandum, Creditor Galaxy International Purchasing, LLC, failed to meet its burden to show that its claim arose from an educational loan or other debt that qualifies for nondischargeability under Section 523(a)(8). The Plaintiff Debtor is, therefore, entitled to a judgment that Galaxy's claim has been discharged.

However, the Court also concludes, as a secondary matter, that if Galaxy's claim were nondischargeable under Section 523(a)(8), the Plaintiff Debtor has failed to establish that he would suffer undue hardship if forced to make payments on Galaxy's debt.

The Court will enter a separate judgment order consistent with this Memorandum Decision finding that Galaxy's claim has been discharged and that the State Court Judgment, which was issued after the Bankruptcy Court's discharge order was entered, is void. The Court's judgment will not be deemed entered until the separate judgment order has been docketed by the Clerk.

# # #

33